RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0096p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────────

IN RE:  DAVID PETER BERGE,

*Debtor*.

─────────────────────────────────────────────

MARKETGRAPHICS RESEARCH GROUP, INC.,

*Plaintiff-Appellant*,

*v.*

DAVID PETER BERGE,

*Defendant-Appellee*.

No. 18-6177

───────────────────

Appeal from the United States Bankruptcy Court
for the Middle District of Tennessee at Nashville.
Nos. 3:13-ap-90400; 3:13-bk-07626—Marian F. Harrison, Judge.

Argued:  June 19, 2019

Decided and Filed:  March 27, 2020

Before:  MOORE, COOK, and READLER, Circuit Judges.

───────────────────

## COUNSEL

**ARGUED:**  Paul J. Krog, LEADER, BULSO & NOLAN, PLC, Nashville, Tennessee, for Appellant.  Steven L. Lefkovitz, LEFKOVITZ & LEFKOVITZ, PLLC, Nashville, Tennessee, for Appellee.  **ON BRIEF:**  Paul J. Krog, LEADER, BULSO & NOLAN, PLC, Nashville, Tennessee, for Appellant.  Steven L. Lefkovitz, LEFKOVITZ & LEFKOVITZ, PLLC, Nashville, Tennessee, for Appellee.

---

**OPINION**

---

CHAD A. READLER, Circuit Judge.    For the Berge family, federal litigation unfortunately has become something of a family affair.  David Berge and his parents, Don and Martha, were named as defendants in an unfair competition lawsuit brought by MarketGraphics Research Group, Inc., a company with which Don had previously been associated.  Before MarketGraphics could proceed to judgment, Don and Martha filed for Chapter 7 bankruptcy.  And when MarketGraphics ultimately obtained a judgment against David, he soon began pursuing Chapter 7 proceedings of his own.

David's Chapter 7 filing made MarketGraphics a judgment creditor in David's bankruptcy proceeding.  MarketGraphics initiated adversary proceedings to assert that its claim should be exempted from discharge in accordance with 11 U.S.C. § 523(a)(6), which prevents a debtor from discharging claims for injuries he willfully and maliciously caused.  According to MarketGraphics, the earlier judgment preclusively established such conduct on David's part.  The bankruptcy court disagreed and denied MarketGraphics's request to exempt its claim from discharge.

We agree with the bankruptcy court.  Nothing in the record of these proceedings or the proceedings for the underlying judgment supports a finding that David acted with the requisite intent under § 523(a)(6) to harm MarketGraphics.  Nor do we accept MarketGraphics's contention that we are precluded from reviewing that issue in the first instance.    Accordingly, we **AFFIRM** the judgment of the bankruptcy court that David's debts are dischargeable.

## I.  BACKGROUND

### A.    David Works For His Father, An Independent Contractor For MarketGraphics.

MarketGraphics collects, analyzes, and distributes data related to residential housing markets.  For the Memphis market, Don served for many years as MarketGraphics's licensee.  Working as an independent contractor, Don collected data and maintained the company's local

client relationships.  To assist with data collection, MarketGraphics licensed its maps and other intellectual property to Don.

From the time he was in high school, David often assisted his father in the business.  Don and David would "driv[e] the market" to determine growth and collect data to generate reports for MarketGraphics.  These efforts continued until 2012, when Don terminated his relationship with MarketGraphics to venture out into the industry on his own.  David, who by that time was a real estate agent living in Nashville, agreed to help his father with his new endeavor.

Don established a new business under the name Realysis.  Realysis consisted of three single-member LLCs.  Don made himself the sole member of Realysis of Jackson, made his wife, Martha, a teacher, the sole member of Realysis, and made David the sole member of Realysis of Memphis.

MarketGraphics sent letters to its Memphis clients letting them know that Don retired and that the company would service their accounts directly.  Despite non-compete and confidentiality provisions in Don's independent contractor agreement with MarketGraphics, Realysis also wanted to service those clients.  So Realysis wrote to MarketGraphics's clients to "clear up the confusion" regarding the distinctions between MarketGraphics Research Group in Nashville and Realysis of Memphis, LLC as well as Don and David's roles in MarketGraphics and Realysis, respectively.  The letter stated that Don and David gathered all of the information for MarketGraphics for fifteen years, that David was now the sole owner of Realysis of Memphis, LLC, and that Realysis would produce reports every quarter going forward.  The letter was sent under David's name and from his Realysis email address.  Realysis's letter generated yet one more letter, this time one from MarketGraphics to Realysis reminding Realysis that Don had signed a contract with non-compete and confidentiality provisions.  But Realysis continued to compete against MarketGraphics—and effectively so.  In under a year, MarketGraphics lost 75 percent of its Memphis-area customers to Realysis.

**B.  MarketGraphics Sues The Berge Family And The Realysis Entities.**

In view of what MarketGraphics perceived as unfair competition by Realysis, MarketGraphics filed a twelve-count complaint in federal district court against Don, David,

Martha, and the Realysis entities.  MarketGraphics asserted a host of claims, including copyright and trademark infringement, unfair and deceptive trade practices under the Tennessee Consumer Protection Act (or TCPA), and violations of Tennessee common law.  MarketGraphics successfully sought a preliminary injunction against all the defendants.

Represented by the same counsel, the defendants filed an answer and responded to MarketGraphics's interrogatory requests.  MarketGraphics in turn moved for summary judgment and submitted an accompanying statement of facts.  When none of the defendants responded to MarketGraphics's motion, MarketGraphics provided the district court with a proposed judgment.  But before the district court entered the proposed judgment, Don and Martha filed for Chapter 7 bankruptcy.  The district court stayed the claims against David's parents, leaving David as the sole remaining active individual defendant.

Soon thereafter, the district court entered judgment against David and the Realysis entities.  The judgment was identical to the proposed judgment that MarketGraphics submitted.  It included several findings regarding David and Realysis, including that they: (1) "willfully or knowingly" violated the TCPA, (2) willfully infringed upon MarketGraphics's copyrighted works, (3) acted in concert with Don to violate Don's non-compete agreement with MarketGraphics, and (4) wrongfully impaired goodwill among Memphis customers and created unfair competition.  The district court permanently enjoined David and the Realysis entities and awarded MarketGraphics $332,314.94 in damages.

### C.    David Seeks To Discharge In Bankruptcy The Debt Associated With The District Court Judgment.

Following the judgment, David joined his parents by filing Chapter 7 bankruptcy proceedings of his own.  MarketGraphics responded by filing an adversarial complaint asserting that David's judgment debt was non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).  To be non-dischargeable under § 523(a)(6), the prior judgment must be for a "willful and malicious" injury.  MarketGraphics then moved for summary judgment.  David opposed the motion, disputing the scope and nature of the district court's findings as to willfulness and malice.

The parties then spent the next four years litigating how to interpret the phrase "willful and malicious." The parties debated whether § 523(a)(6)'s willful-and-malicious standard is a unitary or two-pronged test. And if it is a two-pronged test, the question remained how to define those respective terms (willful and malicious).

With respect to the threshold inquiry, the bankruptcy court applied a two-pronged test, holding that for purposes of § 523(a)(6), the prior judgment must involve an injury shown to be both willful and malicious. As the district court in the earlier action did not address the "malicious" conduct prong, the bankruptcy court denied MarketGraphics's request that the earlier judgment be given preclusive effect in the bankruptcy. The district court denied permission for an interlocutory appeal.

The bankruptcy court then conducted a bench trial. Much of the trial's focus was on David's role in Realysis's operations. Throughout his testimony, David disputed his degree of involvement in and knowledge of the Realysis enterprise. Both David and Don testified that Don was Realysis's primary architect and operator. David claimed his participation in Realysis "was very, very limited." To the extent he engaged with the new entity, it was simply to help his financially unstable, 70-year-old father. David testified that Don sent the solicitation letter to MarketGraphics's clients using David's name. While David reviewed and did not object to the contents of the letter before it was sent, including the use of his name, David believed, based upon Don's representations, that neither he nor Don were subject to the non-compete provision.

Following trial, the bankruptcy court dismissed MarketGraphics's adversarial complaint. The lone "issue at trial," the court explained, "was whether [David] acted with malice." The bankruptcy court found that he did not. While Don had used his family to create an elaborate scheme to avoid liability, David, by comparison, was "very credible" and less culpable.

The case then went back up to the district court, this time before Judge Crenshaw. Taking up the threshold legal issue, the district court found that "[t]he 'willful and malicious' standard in § 523(a)(6) ha[d] evolved" in the Sixth Circuit from a two-pronged approach to a unitary standard. The district court vacated the bankruptcy court's judgment in part and

remanded the case with instructions to decide the question of issue preclusion consistent with this unitary standard.

Back down to the bankruptcy court, then, to examine the preclusive effect of the prior district court judgment. Assessing the earlier judgment, the bankruptcy court concluded that two of the key claims at issue there—the TCPA and Copyright Act claims, respectively—each defined "willful" more broadly than did § 523(a)(6). Thus, the bankruptcy court concluded, the willfulness issues litigated in the prior action were not identical to the issue before the bankruptcy litigation, namely, the application of § 523(a)(6)'s "willfulness and malicious" standard. As to the common law claims, the earlier judgment set forth no undisputed facts or conclusions of law with respect to them, meaning they were neither essential to the judgment nor entitled to preclusive effect.

Free to consider the § 523(a)(6) question anew, the bankruptcy court found that David did not have the level of intent required by the § 523(a)(6) unitary standard and again dismissed MarketGraphics's adversarial complaint. Following that dismissal, we granted MarketGraphics's petition for permission to file a direct appeal to this Court.

## II. ANALYSIS

By and large, today's case poses two questions. One, what is the proper standard to assess "willful and malicious injury" under § 523(a)(6)? Answering that question divided the courts below, as it has the circuit courts. Two, under whichever of those is the correct standard, is the earlier judgment against David entitled to preclusive effect in the present proceeding?

### A. MarketGraphics Must Show That Its Injury Was Both "Willful" And "Malicious" Under § 523(a)(6).

Chapter 7 of the Bankruptcy Code offers a debtor a fresh financial start at the close of his bankruptcy proceeding. *See Harris v. Viegelahn*, 135 S. Ct. 1829, 1835 (2015). To achieve that fresh start, the Bankruptcy Code allows the debtor to discharge in bankruptcy debts owed to his creditors. 11 U.S.C. § 727. And generally speaking, most debts are dischargeable. *See FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 306 (2003).

At issue here is one of the limited exceptions to the general rule favoring discharge. That exception, codified in § 523(a)(6) of the Bankruptcy Code, applies to instances of "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). How to apply that standard, however, has been a point of disagreement among the circuits. As did the most recent district court decision below, some circuits have essentially collapsed the terms "willful" and "malicious," applying a unitary test when assessing the applicability of § 523(a)(6). *See, e.g.*, *McClendon v. Springfield* (*In re McClendon*), 765 F.3d 501, 505 (5th Cir. 2014) (applying the unitary standard and "defining a willful and malicious injury as one where there is either an objective substantial certainty of harm or a subjective motive to cause harm") (internal quotations omitted); *Berrien v. Van Vuuren*, 280 F. App'x 762, 766 (10th Cir. 2008) (same). Other circuits utilize a two-pronged approach, where "willful" and "malicious" remain separate elements for the courts to review. *See, e.g.*, *Margulies v. USAA Cas. Ins. Co.* (*In re Margulies*), 721 F. App'x 98, 101 (2d Cir. 2018) (finding that "willful . . . means deliberate or intentional" and malicious means "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will"); *see also First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013); *Fischer v. Scarborough* (*In re Scarborough*), 171 F.3d 638, 641 (8th Cir. 1999); *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1208–09 (9th Cir. 2001); *Maxfield v. Jennings* (*In re Jennings*), 670 F.3d 1329, 1334 (11th Cir. 2012).

1. Against the backdrop of this deep circuit split, we have cited favorably to the two-pronged approach. *See Doe v. Boland* (*In re Boland*), 946 F.3d 335, 338 (6th Cir. 2020) ("A debtor willfully and maliciously injures a creditor if, acting without just cause or excuse, he knows or is substantially certain that his actions will cause injury."). Today, we explicitly adopt that test.

As an initial matter, the two-pronged approach more squarely accords with customary rules of statutory interpretation. The statute itself invokes two concepts—"willful" and "malicious"—separated by the word "and," which ordinarily suggests that both terms must be satisfied to exempt a debt from discharge. *OfficeMax, Inc. v. United States*, 428 F.3d 583, 588 (6th Cir. 2005) ("'[A]nd' usually does not mean 'or.' Dictionaries consistently feature a conjunctive definition of 'and' as the primary meaning of the word."). The use of "and" in

§ 523(a)(6), moreover, seemingly was no accident.  Compare § 523(a)(6) with § 1328(a)(4) in Chapter 13 of the Bankruptcy Code.  Both sections utilize the terms "willful" and "malicious" in describing injuries that can result in non-dischargeable debts.  But § 1328(a)(4), unlike § 523(a)(6), describes the qualifying injury as "willful *or* malicious." 11 U.S.C. § 1328(a)(4) (emphasis added); *see Doe v. Boland* (*In re Boland*), 596 B.R. 532, 546 n.10 (6th Cir. B.A.P. 2019) (citing *B.B. v. Grossman* (*In re Grossman*), 538 B.R. 34, 39 (Bankr. E.D. Cal. 2015)).  The use of "or" in a parallel part of the Bankruptcy Code, and the use of "and" here, should be given meaning.  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (quotation omitted).

2.  To the same end, collapsing the terms "willful" and "malicious" ignores the fact that, ordinarily understood, those terms have separate meanings, and separate purposes.  Start with "willful."  "Willful" conduct, for purposes of § 523(a)(6), requires "actual intent to cause injury," "not merely a deliberate or intentional *act* that leads to injury."  *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998); *see also In re Boland*, 946 F.3d at 338 ("[A] debtor might act intentionally but simply not *know* that the act will cause injury.") (emphasis added).

In holding that a debtor must have "actual intent to cause injury" to have acted willfully, *Geiger* left unresolved how to measure that intent.  Some circuits have resolved the question by taking a broad approach, utilizing both objective and subjective tests.  Under that standard, a debtor acts willfully where his actions were objectively substantially certain to cause harm or, alternatively, where the debtor had a subjective motive to cause harm.  *See In re McClendon*, 765 F.3d at 505.  This Circuit, on the other hand, utilizes only a subjective standard, asking whether the debtor himself was motivated by a desire to inflict injury.  *See, e.g.*, *Markowitz v. Campbell* (*In re Markowitz*), 190 F.3d 455, 464 (6th Cir. 1999) (adopting the subjective approach, in which a debt is nondischargeable under § 523(a)(6) only if the debtor intended to cause harm or knew that harm was a substantially certain consequence of his or her behavior).  Put differently, the debtor must "desire[] to cause consequences of his act, or . . . believe[] that the consequences are substantially certain to result from it."  *Id.* (internal citations omitted).  A debtor need not actually admit his intent; intent may be inferred from the circumstances of the

injury. *See, e.g.*, *O'Brien v. Sintobin* (*In re Sintobin*), 253 B.R. 826, 831 (Bankr. N.D. Ohio 2000).

3. Now the term "malicious." In defining "willful," *In re Markowitz* inferred that, in the § 523(a)(6) setting, the term typically would be read to mean something different than "malicious": "From the plain language of the statute, the judgment must be for an injury that is *both* willful and malicious. The absence of one creates a dischargeable debt." 190 F.3d at 463 (emphasis added). Likewise, in a case that pre-dates *Geiger*, we similarly suggested that the two terms are not synonymous. *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986) (citations omitted).

With that understanding in mind, in *Wheeler* we defined "malicious," for purposes of § 523(a)(6), to mean "in conscious disregard of one's duties or without just cause or excuse . . ." 783 F.2d at 615 (citations omitted); *see also Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (defining "malicious" as "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will") (quotations omitted); *Sells v. Porter* (*In re Porter*), 539 F.3d 889, 894 (8th Cir. 2008) ("Maliciousness is conduct targeted at the creditor . . . at least in the sense that the conduct is certain or almost certain to cause . . . harm.") (internal quotations omitted). Unlike willful conduct, malicious conduct typically does not require "a showing of specific intent to harm another . . . ." *In re Jennings*, 670 F.3d at 1334; *see also Yeager v. Wilmers*, 553 B.R. 102, 107 (S.D. Ohio 2015), *aff'd* No. 15-4169 (6th Cir. July 19, 2016). And as to the requirement that malicious conduct be taken "without just cause," Black's Law Dictionary defines "just cause" as "[a] legally sufficient reason," and "excuse" as "[a] reason that justifies an act or omission or that relieves a person of a duty." BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Murray v. Bammer* (*In re Bammer*), 131 F.3d 788, 792 (9th Cir. 1997) (en banc) (reading "just" to be synonymous with "honorable and fair in dealings and actions, consistent with moral right, and valid within the law") (internal quotations and citations omitted).

4. As text and precedent thus reflect, assessing whether an injury is "willful and malicious" under § 523(a)(6) is a two-pronged inquiry. A creditor must prove both elements before the debt may be exempted from discharge. To be sure, in many cases, the same facts that

support a finding of willful conduct under § 523(a)(6) will likewise support a finding that the debtor acted with malice. *See Superior Metal Prods. v. Martin* (*In re Martin*), 321 B.R. 437, 442 (Bankr. N.D. Ohio 2004) (noting that in the "great majority of cases, the same factual events that give rise to a finding of 'willful' conduct, will likewise be indicative as to whether the debtor acted with malice"). But in other cases, for example, a debtor may act willfully, but not maliciously. *See id.* ("[A] debtor, in certain limited situations, may be found to have willfully converted a creditor's property, but not to have acted in a malicious manner."); *see also Olmstead v. Newman* (*In re Newman*), 385 B.R. 799 (B.A.P. 6th Cir. 2008) (finding that debtor-employer, bought by another company, willfully refused to pay creditor-employee her vacation benefits, but did not act maliciously because it "earnestly believed" that the new owners were responsible for the creditor-employee's benefits); *Fleming Mfg. Co. v. Keogh* (*In re Keogh*), 509 B.R. 915, 939 (Bankr. E.D. Mo. 2014) (debtor willfully breached fiduciary duties as company president but did not act maliciously); *In re Martin*, 321 B.R. at 442 (citing *John Deere Credit Serv. v. McLaughlin* (*In re McLaughlin*), 109 B.R. 14, 18 (Bankr. D.N.H. 1989) (finding willful but not malicious conduct); then citing *Rech v. Burgess* (*Matter of Burgess*), 106 B.R. 612, 616–20 (Bankr. D. Neb. 1989) (same)). Lower courts thus must analyze independently whether a debtor has willfully, and also maliciously, injured the creditor before rendering a debt non-dischargeable in accordance with § 523(a)(6).

**B.    The Underlying Judgment Did Not Preclude The Bankruptcy Court From Independently Analyzing Whether David's Conduct Was Willful And Malicious.**

Having articulated the test in our Circuit for applying the discharge exception in § 523(a)(6), we must now consider whether the bankruptcy court was nevertheless precluded from applying that test in light of the judgment in the earlier unfair competition lawsuit against David, which MarketGraphics asserts carries preclusive effect.

Issue preclusion prevents a party from relitigating issues of fact or law actually litigated and decided in a prior proceeding. *In re Markowitz*, 190 F.3d at 461–62. Neither the Supreme Court nor this Court has resolved whether federal or state issue-preclusion law governs a federal proceeding where a federal court exercises federal jurisdiction over the federal claims and supplemental jurisdiction over the state law claims. In a somewhat similar circumstance, the

Supreme Court held that when a federal court exercises diversity jurisdiction over a state law claim, federal common law governs the issue preclusion analysis. *Semtek Int'l v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001).

Whether *Semtek* suggests the same outcome when a federal court exercises supplemental jurisdiction was recently answered in the affirmative by the Fourth Circuit. *Hately v. Watts*, 917 F.3d 770, 777 (4th Cir. 2019); *see also Wu v. Lin* (*In re Qiao Lin*), 576 B.R. 32, 46 (Bankr. E.D.N.Y. 2017) (same); *Marini v. Adamo* (*In re Adamo*), 560 B.R. 642, 647 (Bankr. E.D.N.Y. 2016). Both the Supreme Court and Fourth Circuit, in reaching those respective conclusions, emphasized that federal preclusion law directs courts to apply "the law that would be applied by state courts in the State in which the federal diversity court sits," so long as the state rule is not "incompatible with federal interests." *Semtek*, 531 U.S. at 508–09 (citations omitted); *see also Hately*, 917 F.3d at 777 (finding *Semtek*'s rationale "equally persuasive in cases in which federal courts exercise supplemental, as opposed to diversity, jurisdiction over state law claims").

We need not conclusively resolve this issue today. As both relevant cases were litigated in federal court in Tennessee, with claims raised under both Tennessee and federal law, either Tennessee or federal preclusion law would apply. And Tennessee preclusion law is compatible with federal interests (indeed, the respective preclusion rules are the same). So there is little if any difference in the preclusion analysis we might apply, and certainly no tension between the two.

Whether we apply federal or Tennessee issue-preclusion law is thus of little practical concern in this case; the tests are nearly the same. That is, a party is barred from relitigating an issue already decided when: (1) the issues are identical; (2) the issue was actually litigated and decided previously; (3) the judgment in the earlier proceeding has become final (Tennessee's rule) or resolution of the issue was necessary and essential to a judgment on the merits (our rule); (4) the party to be estopped was a party to the prior litigation; and (5) the party to be estopped had a full and fair opportunity to litigate the issue. *Compare Mullins v. State*, 294 S.W.3d 529, 535 (Tenn. 2009), *with Wolfe v. Perry*, 412 F.3d 707, 716 (6th Cir. 2005). Critical to our resolution here are the first two prongs of issue preclusion. That is, whether David's subjective intent, a requirement for a finding of willfulness under § 523(a)(6), was actually litigated in the

underlying district court proceedings, and, if so, whether the factual issue litigated there was identical to the issue resolved in the district court.

1. For issue preclusion to apply for purposes of satisfying § 523(a)(6), the issue in question must have been "actually litigated and decided" in the earlier proceeding. *See Wolfe*, 412 F.3d at 716. With respect to § 523(a)(6)'s "willful and malicious" requirement, we have explained that assessing willful conduct requires examining the debtor's subjective intent. For preclusion to apply here, then, the parties must have actually litigated and decided in the earlier proceeding that David acted with subjective intent to harm MarketGraphics, the same issue at play in the underlying proceedings here. *See MarketGraphics Research Grp., Inc. v. Berge* (*In re Berge*), No. 313-07626, 2018 WL 3219626, at *2 (Bankr. M.D. Tenn. June 29, 2018) ("The issue is whether that judgment included a finding that the debtor intended harm to MarketGraphics or was substantially certain that harm would occur as required under 11 U.S.C. § 523(a)(6)."). Following its review of the underlying judgment, the bankruptcy court concluded that such evidence was absent from the earlier district court proceeding: "[T]here is no clear finding" that David "desired to cause the consequences of his act or believed that the injuries were substantially certain to result from it," nor are there "factual allegations in the underlying complaint" to that effect. *Id.* at *3.

We agree. The record in the district court litigation was sparse. The district court judgment included a determination that David and the Realysis entities "willfully or knowingly" violated the TCPA and willfully infringed upon MarketGraphics's copyrighted works. But outside the judgment, the record contains no findings concerning David's intent. Among other omissions, there is no indication that whether David participated in the creation and management of Realysis, and whether he did so with the intent to injure MarketGraphics, was actually litigated or decided in the district court.

Nor did MarketGraphics present undisputed facts from the earlier district court proceeding that conclusively established David's intent to injure. To be sure, as the earlier record reflects, David had a long history of supporting Don's work, both with MarketGraphics and Realysis. And as to the latter, the record reveals that David was named as the sole member and officer or manager of Realysis of Memphis, LLC, one of three Realysis entities created by

Don. But nothing in the district court record shows that David had a role in organizing the Realysis entities or that he knew that Realysis of Memphis was created in his name.

Upon Realysis's creation, emails and letters were sent from David's Realysis email address, under his name, in a not-so-subtle effort to solicit MarketGraphics's customers. Here again though, the letters primarily discussed Don's (not David's) relationship with MarketGraphics as well as Don's knowledge of the industry. True, only David's name was provided in response to an interrogatory request to "[i]dentify each person who has sold, or attempted to sell, goods or services related to the Memphis Metro Area on behalf of any Realysis Entity." But in the statement of facts that MarketGraphics submitted when it moved for summary judgment, the company indicated that Realysis of Memphis, the entity in David's name, had two offices: one at Don's house and another in a space Don rented in his name. All of the data Realysis collected was in a computer at Don's house. And, perhaps unsurprisingly, Realysis customers were more likely to call Don (rather than David) with questions regarding the Realysis business.

Nor does the record contain factual findings describing whether David willfully, with subjective intent, infringed MarketGraphics's copyrights. The defendants there rightly admitted that MarketGraphics's works had been registered with the Register of Copyrights and contained some material subject to protection under the Copyright Act. Yet they also asserted that "[a]ll materials claimed by MarketGraphics are neither trade secrets nor copyrighted and exists [sic] in the public domain." These latter assertions thus undermine any conclusion supporting a subjective intent to infringe upon MarketGraphics's copyrights.

Perhaps most revealing is the judgment submitted in the underlying litigation. MarketGraphics drafted and submitted the proposed judgment to the district court, and the district court adopted that order without change. MarketGraphics did so with the benefit of knowing that the judgment could be the subject of a bankruptcy proceeding; David's parents, after all, had already filed for bankruptcy during the pendency of the district court action. Yet even armed with that knowledge, MarketGraphics did not include any findings in the judgment revealing David's subjective intent to injure MarketGraphics.

All told, to the extent David was involved in the Realysis enterprise, the factual findings and record in the district court action do not reflect a subjective intent on David's part to injure MarketGraphics. For that reason, the prior judgment and the underlying record do not preclusively establish that David acted willfully, with subjective intent, as required to satisfy § 523(a)(6)'s discharge exception.

2. Whatever the nature of the record and general findings in the earlier judgment, MarketGraphics responds that the ultimate finding in favor of the company on its TCPA and copyright-infringement claims proves David's subjective intent to harm, thereby satisfying the willfulness prong of § 523(a)(6). That argument, however, is at odds with case law interpreting those statutes. Neither the state nor federal law at issue required MarketGraphics to prove that David acted with subjective intent to harm the company.

Start with the TCPA. The TCPA creates a private right of action for "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice . . . ." TENN. CODE ANN. § 47–18–109(a)(1). The TCPA's scope is "much broader" than that of common law fraud and is "not limited to misrepresentations that are fraudulent or willful." *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005). Thus, "[t]he defendant's conduct need not be willful or even knowing." *Id*. But if a defendant does willfully or knowingly violate the TCPA, the TCPA provides for treble damages. § 47–18–109(a)(3); *Tucker*, 180 S.W.3d at 115–16. Here, the judgment against David was a treble damages award for a "willful or knowing violation" of the TCPA.

MarketGraphics argues that a "willful or knowing" TCPA violation requires more than simply intending an act that violates the TCPA. Instead, a "willful or knowing" TCPA violation, in its view, requires a subjective intent to injure—the same intent required under § 523(a)(6).

"Willful or knowing" is a disjunctive test. Even if the TCPA term "willful" satisfies § 523(a)(6), a "knowing" TCPA violation must also amount to a "willful and malicious injury." For purposes of the TCPA, the term "knowingly" has been commonly recognized as a lower

standard than "willful." *See, e.g.*, *Tucker*, 180 S.W.3d at 115–16 ("[D]efendant's conduct need not be willful *or even knowing*, but if it is, the TCPA permits the trial court to award treble damages." (emphasis added)).　　The TCPA defines "knowingly" as "actual awareness of the falsity or deception, but actual awareness may be inferred where *objective manifestations* indicate that a reasonable person would have known or would have had reason to know of the falsity or deception." TENN. CODE ANN. § 47-18-103(11) (emphasis added).

Proving "knowing" conduct under the TCPA, in other words, merely requires showing that a reasonable person, in the circumstance in question, would have known or had reason to know about the act. *See id.*　Subjective intent to injure, as required by § 523(a)(6), is not required to commit a knowing violation of the TCPA.　That leaves considerable doubt over whether the district court's underlying judgment made any finding as to David's level of intent. *Compare Couch v. Panther Petro., LLC* (*In re Couch*)*,* 704 F. App'x 569, 571–72 (6th Cir. 2017) (finding a state court judgment preclusive where the state court specifically found that defendant owed treble damages for a TCPA claim because he "intentionally, willfully, and maliciously" injured plaintiffs), *with McGee v. Marcum*, 184 F. App'x 464, 466 (6th Cir. 2006) (finding that although the defendant pleaded guilty to a willful violation of the Federal Mine Safety and Health Act, there was no evidence in the record that defendant desired to injure plaintiff, and therefore the district court judgment did not preclude the bankruptcy court from independently analyzing the judgment under § 523(a)(6)).　Without a subjective intent to injure, there can be no willful injury under § 523(a)(6).

Recently, we held that intent to injure for purposes of § 523(a)(6) can sometimes be inferred from a knowing act. *In re Boland*, 946 F.3d at 338, 341–42.　In *Boland*, a defense attorney sought discharge of judgments against him resulting from his creation of child pornography.　In a misguided defense of his clients, the attorney had manipulated stock images of children so that they appeared to be engaged in sex acts, to make the point that "there's just no way of knowing whether real children are depicted in pornography found on the internet." *Id.* at 337.　In his bankruptcy proceedings, the debtor-attorney argued that he did not intend to harm the children through his actions.　There, the intent to injure was implicit because creating child pornography is itself the injury. *Id.* at 341–42.　Not so here. A knowing violation of consumer

protection laws does not carry the same inference of intent as the knowing creation of child pornography. Were we broadly to presume intent to injure from a variety of actions, exemptions to discharge—which are disfavored—would abound in bankruptcy proceedings. We are also mindful of our precedent requiring subjective, not objective, intent to injure. *See In re Markowitz*, 190 F.3d at 464.

Further, under the two-pronged § 523(a)(6) "willful and malicious injury" test, a "willful or knowing" TCPA violation must also be "malicious" for the judgment to be exempt from discharge. "'Malicious' means in conscious disregard of one's duties or without just cause or excuse." *Wheeler*, 783 F.2d at 615; *Tomlin v. Crownover* (*In re Crownover*), 417 B.R. 45, 57 (Bankr. E.D. Tenn. 2009) ("The intent to cause injury to another person or another person's property is malicious *unless* the debtor had a just cause or excuse for acting with the intent to cause the injury."). For issue preclusion to apply, then, a "willful or knowing" TCPA violation must require the conscious disregard of a duty or lack of just cause or excuse. The TCPA requires no such thing. To the contrary, under the TCPA, a court "*may* consider, *among other things*" the debtor's competence and good faith, along with the nature of the act and the degree of harm. TENN. CODE ANN. § 47–18–109(a)(4) (emphasis added). Under this permissive framework, it is impossible to know, without additional fact finding, why the court ordered treble damages. Therefore, under either the "willfulness" or "malice" prongs, a "willful or knowing" TCPA violation does not, on its face, carry preclusive effect.

So too for MarketGraphics's copyright-infringement claim. To establish a claim for direct copyright infringement, a plaintiff must show that he owns the copyright and that the defendant copied protected elements of his work. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 534 (6th Cir. 2004). A defendant willfully commits copyright infringement when he knowingly or recklessly copies another's work. *Zomba Enters., Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 585 (6th Cir. 2007) (willfulness includes reckless disregard of plaintiff's property rights).

That recklessness can satisfy the willfulness requirement suggests that a copyright-infringement judgment does not always prove subjective intent to harm, something the Ninth Circuit has already recognized. *See Barboza v. New Form, Inc.*, 545 F.3d 702 (9th Cir. 2008).

At issue in *Barboza* was a jury instruction from an earlier proceeding that stated that infringement was "willful" if defendants "knew that they were infringing the [Appellee's] copyrights or that they acted with reckless disregard as to whether they were doing so." *Id.* at 704. Where "a finding of 'willful' copyright infringement is based merely on reckless behavior," the Ninth Circuit explained, "the resulting statutory award would not fit within the § 523(a)(6) exemption." *Id.* at 708 (noting that *Geiger* specifically limited willful injuries under § 523(a)(6) to deliberate or intentional injuries).

We agree with that approach. Because a finding of "willful" copyright infringement can be predicated upon merely reckless behavior, a copyright-infringement judgment does not necessarily prove the infringer's subjective intent to harm. For purposes of issue preclusion, in other words, MarketGraphics's judgment did not necessarily litigate and decide David's subjective intent. It follows that the bankruptcy court was not precluded from finding that § 523(a)(6) was inapplicable to MarketGraphics's underlying judgment, and thus finding the judgment debt dischargeable. *See Geiger*, 523 U.S. at 61–64 ("[D]ebts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6).").

Our decision in *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, does not say otherwise. In *Bridgeport*, the alleged copyright infringer asserted a good faith defense against a finding of willfulness. 585 F.3d 267, 279 (6th Cir. 2009). MarketGraphics reads *Bridgeport* to stand for the proposition that a finding of willful infringement can only be predicated on recklessness if the defendant raises the "good faith" defense. But that was not our holding. There, we rejected the defendant's challenge to the jury instruction on willful infringement. Although the district court, we concluded, erred by omitting the term "reckless" in the instructions, the "knowledge" aspect of "reckless" was nevertheless included in the good-faith-defense instruction, meaning that when reviewing the instructions as a whole, the jury ultimately received sufficient instructions. *Id.* at 278–79. That decision, however, says nothing about limiting the reckless aspect of copyright infringement to instances where the good faith defense is raised.

At day's end, then, the finding that David was liable for willful copyright infringement, like the TCPA finding, does not support the application of issue preclusion in this proceeding. Nothing in those findings or the proceeding more broadly reflects resolution of the question of

David's subjective intent to injure. As we cannot say with conviction that subjective intent was "actually litigated and decided previously," we cannot give the underlying judgment preclusive effect for purposes of discharging MarketGraphics's claim under § 523(a)(6).

Nor does the underlying judgment provide preclusive effect from discharge for the common law claims asserted by Market Graphics. Even assuming that the common law claims facially demonstrate "willful and malicious" injury, the underlying judgment is too vague to carry preclusive effect.

The district court in the underlying federal action ordered damages for copyright infringement, a TCPA violation, and an unknown source of "other compensatory damages." Theoretically, the common law claims might be the basis for the district court's award for "other compensatory damages." But we have no way of knowing, as the district court did not even analyze those claims. The lone issue the district court analyzed was its basis for imposing a permanent injunction. In MarketGraphics's view, the district court's permanent injunction analysis doubles as its analysis of the common law claims. But even accepting that as true, there is no way to parse out the amount of damages for each of the three purported common law violations. Neither the complaint nor the judgment lists damages figures for each of the claims—leaving it to conjecture as to which claims make up which parts of the "other compensatory damages." In view of these uncertainties, preclusion does not apply to the common law claims either.

## C. The Bankruptcy Court Properly Declined To Apply The Doctrine Of Judicial Estoppel.

Short of formal preclusion, MarketGraphics claims that, at the very least, David should be "judicially estopped" from arguing in this proceeding that he lacked the subjective intent to harm MarketGraphics. To the company's mind, David engaged in something of a "bait and switch." The Berges, says MarketGraphics, asserted in the initial proceeding that David (not Don) was the culprit behind Realysis's unfairly competitive efforts, with David then changing his tune in this proceeding, laying blame at Don's feet.

Judicial estoppel is an equitable doctrine invoked to preserve the integrity of our judicial system. *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001). Generally speaking, the doctrine serves to prevent a party from engaging in "cynical gamesmanship" by arguing and prevailing on one position before one court, and then arguing the opposite position before another. *Lorillard Tobacco Co. v. Chester, Willcox & Saxbe, LLP*, 546 F.3d 752, 757 (6th Cir. 2008) (internal citations omitted). For judicial estoppel to apply, three features should be present: (1) the party's prior and later positions are clearly inconsistent; (2) the earlier court accepted the prior position; and (3) the opposing party would be unfairly disadvantaged by the subsequent court accepting the party's later, inconsistent position. *New Hampshire*, 532 U.S. at 750–51 (internal quotation marks and citations omitted); *see also Lorillard Tobacco Co.*, 546 F.3d at 757 (citing *Excel Energy, Inc. v. Smith* (*In re Commonwealth Inst. Sec.*), 394 F.3d 401, 406 (6th Cir. 2005)).

Those features are absent here. First, while David's respective positions regarding who operated Realysis were in some tension, they were not "clearly inconsistent." To be sure, David's explanation concerning his limited role in the underlying conduct in the bankruptcy court was at odds in some respects with the Berge family's position in the district court that David (not Don) was the mastermind behind Realysis. But it was always the case that Don had some involvement with Realysis, and David's position in the bankruptcy court was influenced by responding to the factual determinations made previously by the district court. To that same end, the record reflects that the district court, in the underlying litigation, did not appear to accept David's position there. Indeed, the district court seemingly rejected the notion that David was the responsible party. At the preliminary injunction hearing, the district court apparently believed that Don was responsible for the operation of Realysis. Nor, in any event, has MarketGraphics explained how David's purported prior assertions impacted or otherwise unduly prejudiced the company in the current bankruptcy proceeding. In the proceedings below, MarketGraphics was unencumbered in making its evidentiary case. Among its efforts, the company introduced at trial the interrogatory response stating that David was the only person who sold, or attempted to sell, goods or services on behalf of Realysis. It likewise introduced emails and letters under David's name from Realysis to MarketGraphics's clients. And it was

able to question David about them.   As such, the bankruptcy court properly rejected MarketGraphics's request to invoke judicial estoppel.

## III.  CONCLUSION

For these reasons, we **AFFIRM** the judgment of the bankruptcy court.